IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| Kevin P Osborne, | Case No. 3:15 CV 2721 |
| Plaintiff, | MEMORANDUM |
| -vs- | OPINION AND ORDER |
| Wood County, Ohio, et al., | JUDGE JACK ZOUHARY |
| Defendants. | |

### INTRODUCTION

Deputy Kevin Osborne sues fellow Deputy Kert Appelhans for false arrest, false imprisonment, and malicious prosecution -- both state-law tort claims and constitutional claims under 42 U.S.C. § 1983 -- as well as intentional infliction of emotional distress, negligence per se, defamation, and defamation per se (Doc. 23). He also sues Wood County under a theory of respondeat superior liability (*id.*). Appelhans and Wood County move for summary judgment based on qualified immunity (Doc. 49). Osborne opposes (Doc. 55).

### UNDISPUTED MATERIAL FACTS

Osborne is a part-time police officer in the Village of Risingsun, Ohio (Doc. 58 at ¶ 1). On July 24, 2015, while on duty, Osborne responded to a domestic dispute between Cody and Krystal Albert (Doc. 51 at 21–22). Cody believed Krystal was having an affair with a man named Robert Dean (Doc. 71 at 6). The following day, while off duty, Osborne encountered Krystal and Dean at the Wayne County Jamboree (Doc. 51 at 13–14). Osborne confronted them and called Dean a "piece of shit" (Doc. 71 at 7). On the evening of July 29, 2015, Osborne finished his shift at 6:00 PM.

Around that time, Cody informed Osborne that Dean and Krystal intended to "cause trouble" for Osborne (Doc. 51 at 20–21; Doc. 72 at 5).

Following the end of his shift that evening, Osborne returned home. Around 9:50 PM, Osborne noticed a red pickup truck with a "loud exhaust" pass his home repeatedly, rapidly accelerating and then sitting at the stop sign for ten to fifteen seconds at a time (Doc. 51 at 24–25). Osborne estimated the truck drove past his home at least fifteen times (*id.*; Doc. 58 at ¶ 3; Doc. 72 at 3). He thought he recognized the truck and suspected it was being driven by someone with a suspended license (Doc. 51 at 33; Doc. 72 at 3).

Osborne took his personal vehicle and followed the red pickup. He was not wearing his uniform or carrying any form of identification (Doc. 58 at ¶¶ 3, 5). He carried his loaded service weapon on his lap (Doc. 72 at 4). Osborne called the Wood County Sheriff's Dispatch (Doc. 72 at 3). He identified himself as a Risingsun police officer and asked Dispatch to run the pickup's license plate (*id.*). Dispatch advised the truck belonged to Robert Dean (*id.*). Osborne requested back-up, and Defendant Deputy Kert Appelhans and Deputy Britni Aring were dispatched (*id.* at 6).

While Osborne was on the phone with Dispatch, Dean pulled over, got out of his truck, and walked back to Osborne's car (Doc. 72 at 4). Osborne identified himself as a Risingsun police officer, advised Dean that the Sheriff was on the way, and instructed Dean to return to his truck and wait (*id.* at 4, 6). Dean called 9-1-1 and told Dispatch he was driving around Risingsun, waiting for a friend, when he noticed Osborne following him and pulled over (*id.* at 10). Dean asked Dispatch if he could leave. Dispatch first instructed Dean to wait at the scene until the deputies arrived (*id.*). After discussion with Sergeant Greg Panning, Appelhans and Aring's supervisor, Dispatch advised Dean he could leave (*id.* at 13–14). However, Aring arrived on the scene before Dean ended the call with

2

Dispatch (*id.*). Dean and Osborne had been waiting in their respective vehicles for about fifteen minutes, from the time Dean pulled over until Aring's arrival (*id.* at 7, 16–17).

Aring and Appelhans spoke with Osborne and Dean separately. Osborne told Appelhans he became "leery" when he saw Dean's pick-up drive past his house at least fifteen times (Doc. 71 at 5). Based on his communications with Dispatch, Appelhans was aware of the domestic dispute at the Alberts residence and related confrontation between Osborne and Dean at the Jamboree (Doc. 69 at 2–3; Doc. 72 at 9). He was also aware that Dean voluntarily pulled over and approached Osborne, who identified himself as a police officer, and that Osborne called the Sheriff's Dispatch and requested assistance (Doc. 69 at 3; Doc. 72 at 7). Appelhans observed Osborne's handgun in the passenger seat of his car (Doc. 69 at 3). Osborne told both Aring and Dispatch about Dean's threat to "cause trouble" for him (Doc. 71 at 7; Doc. 72 at 5), though the parties dispute whether Osborne directly informed Appelhans as well.

When Aring and Appelhans spoke with Dean, he informed them he was driving around the neighborhood waiting to return Krystal's phone charger (Doc. 50-7 at 1; Doc. 71 at 2–3). Dean confirmed he pulled over when he noticed Osborne following him, and he approached Osborne's vehicle (*id.*). He also confirmed he knew Osborne was a police officer; he saw Osborne holding his gun on his lap; and Osborne ordered him not to leave (Doc. 50-7 at 1–2). Dean also informed the deputies that Osborne later attempted to approach him in his truck, but Dean rolled up his window and called the Sheriff (*id.* at 2; Doc. 71 at 3). Dean claimed he felt threatened by Osborne's actions (Doc. 50-7 at 2).

Appelhans spoke with Panning, who recommended Appelhans call Bowling Green Municipal Prosecutor Matt Reger to discuss several potential charges against Osborne (Doc. 69 at 2). Appelhans

3

called Reger, and they spoke for about eight and a half minutes (*id.* at 3–5). Based on their conversation, Reger advised Appelhans he had probable cause for the aggravated menacing charge (Doc. 53 at 72). However, Reger also told Appelhans he was unsure of the elements for unlawful restraint and likewise could not offer advice on the improper firearm handling charge (*id.* at 73–75). Reger asked whether Appelhans planned to arrest Osborne and offered to review the evidence and arrest paperwork in the morning (Doc. 50 at 120). Appelhans responded, "I'm thinking we're just going to arrest him and get this thing taken care of" (Doc. 69 at 5). Appelhans was concerned the confrontation between Osborne and Dean might re-escalate after the deputies left the scene. Appelhans arrested Osborne and allowed Dean to leave (Doc. 50 at 121).

### DISPUTED MATERIAL FACTS

Osborne claims Appelhans and Panning decided to arrest him before Appelhans arrived on the scene, motivated by some sort of personal malice (Doc. 55 at 5; Doc. 58 at ¶ 15). He asserts Appelhans and Panning had previously made derogatory comments about him, including in conversation with other police officers, and Panning joked about Osborne's arrest with Dispatch later that evening (Doc. 55 at 5).

Osborne also contends he personally informed Appelhans of (1) his prior encounter with Dean at the Jamboree, (2) Dean's threat to "cause trouble" for Osborne, and (3) Dean's allegedly erratic driving, including revving the engine and squealing the tires as he drove past Osborne's home (Doc. 55 at 3–4; Doc. 58 at ¶ 14). He notes Appelhans' personal microphone was malfunctioning that evening and did not record their conversation (Doc. 55 at 5). Appelhans acknowledges his microphone was not working (Doc. 50 at 47–48) but contests Osborne's description of their discussion (Doc. 49 at 3–4; Doc. 50 at 51–53, 58).

4

**STANDARD OF REVIEW**

Summary judgment is appropriate where there is "no genuine dispute as to any material fact," such that the moving party "is entitled to judgment as a matter of law." Federal Civil Rule 56(a). This Court must draw all inferences from the record in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). This Court does not weigh the evidence or determine the truth of any matter in dispute; rather, this Court evaluates only whether the record contains sufficient evidence from which a jury could reasonably find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).

**DISCUSSION**

Qualified immunity protects state officials who perform discretionary functions from standing trial for civil liability unless their conduct violates clearly established rights. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The plaintiff bears the burden of overcoming the qualified immunity defense. *Thompson v. City of Lebanon*, 831 F.3d 366, 369 (6th Cir. 2016). The standard for qualified immunity is "whether a reasonable official in the defendant's position could have believed that his conduct was lawful, judged from the perspective of the reasonable official on the scene." *Cochran v. Gilliam*, 656 F.3d 300, 306 (6th Cir. 2011) (citing *Anderson v. Creighton*, 483 U.S. 635, 640–41 (1987)). In evaluating the qualified immunity defense on summary judgment, this Court views the facts "in the light most favorable to the party asserting the injury." *Parsons v. City of Pontiac*, 533 F.3d 492, 500 (6th Cir. 2008) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

This Court must make two inquiries: first, whether the facts, viewed in the light most favorable to Osborne, constitute a violation of a statutory or constitutional right; and second, whether that right was "clearly established" at the time of the incident, such that a reasonable officer would have known

his behavior was unlawful. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). This Court may consider these two prongs in either order. *Id.* at 236. Appelhans is entitled to qualified immunity "[o]nly if the undisputed facts or the evidence viewed in the light most favorable to [Osborne] fail to establish a *prima facie* violation of clear constitutional law." *Cochran*, 656 F.3d at 300 (quoting *Berryman v. Rieger*, 150 F.3d 561, 563 (6th Cir. 1998)). In other words, if this Court concludes Osborne's evidence "would reasonably support a jury's finding that [Appelhans] violated a clearly established right, it must deny summary judgment." *Thompson*, 831 F.3d at 370.

### Probable Cause

"[I]t is well established that any arrest without probable cause violates the Fourth Amendment." *Crockett v. Cumberland College*, 316 F.3d 571, 580 (6th Cir. 2003). To create probable cause for arrest, "the 'facts and circumstances within the officer's knowledge [must be] sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing or is about to commit an offense.'" *Thacker v. City of Columbus*, 328 F.3d 244, 255 (6th Cir. 2003) (quoting *Crockett*, 316 F.3d at 580) (alteration in original). Once an officer has probable cause, he is under no obligation to search for exculpatory evidence or otherwise continue to investigate. *Crockett*, 316 F.3d at 581 (citing cases). However, he may not "turn a blind eye" to potentially exculpatory information presented to him. *Ahlers v. Schebil*, 188 F.3d 365, 372 (6th Cir. 1999). Instead, the officer must consider the "totality of the circumstances" within his knowledge, including both inculpatory and exculpatory evidence. *Courtright v. City of Battle Creek*, 839 F.3d 513, 521 (6th Cir. 2016) (quoting *Wesley v. Campbell*, 779 F.3d 421, 429 (6th Cir. 2015)). "The existence of probable cause is a jury question, unless there

6

is only one reasonable determination that is possible." *Thacker*, 328 F.3d at 255; *see also Parsons*, 533 F.3d at 501.

Appelhans contends he had probable cause to charge -- and therefore to arrest -- Osborne for unlawful restraint, aggravated menacing, and improper handling of a firearm. This Court considers each of those charges in turn.

*Unlawful Restraint.* Ohio law provides "[n]o person, without privilege to do so, shall knowingly restrain another of the other person's liberty." OHIO REV. CODE § 2905.03(A). A "privilege" is a right conferred by law or arising out of status, position, office, or relationship. *Id.* § 2901.01(A)(12). For example, a police officer may briefly detain someone for investigation based on "a reasonable, articulable suspicion that [they] may be involved in criminal activity." *Loza v. Mitchell*, 766 F.3d 466, 476 (6th Cir. 2014). The investigatory stop must be both "justified at its inception" and "reasonably related in scope to the circumstances which justified the interference in the first place." *Id.*

A reasonable suspicion of criminal activity must be based on "particularized and objective" facts. *United States v. Shank*, 543 F.3d 309, 313 (6th Cir. 2008) (quoting *Weaver v. Shadoan*, 340 F.3d 398, 407 (6th Cir. 2003)). This is a lesser standard than required for probable cause. *Id.* ("[R]easonable suspicion 'can arise from evidence that is less reliable than what might be required to show probable cause.'") (citation omitted). An "ill-defined hunch" is insufficient, but an officer may "draw on [his] own experience and specialized training to make inferences from and deductions about the cumulative information available to [him]." *Id.* at 313, 315. The officer's "actual subjective motivations" for conducting the stop are irrelevant to its validity, if the stop is justified by sufficient objective facts. *Id.* at 313.

7

Appelhans contends he had probable cause to arrest Osborne for unlawful restraint because Osborne lacked a "reasonable, articulable suspicion" for following and detaining Dean. The record, viewed in the light most favorable to Osborne, suggests otherwise. Appelhans identifies three primary pieces of potentially inculpatory evidence that he believes support a probable cause finding: (1) Osborne was off duty at the time of the incident; (2) Osborne ordered Dean to return to his truck and to stay put (*i.e.*, he did in fact detain Dean); and (3) Dean felt threatened because he knew Osborne was armed.

Appelhans particularly emphasizes the first of these facts -- that Osborne was off duty when he decided to follow and ultimately detained Dean. But an off-duty law enforcement officer, "[a]s a matter of public policy and statutory mandate," is still required to enforce the law and prevent criminal activity. *Luketic v. Univ. Circle, Inc.*, 134 Ohio App. 3d 217, 222–23 (1999); *see also State v. Clark*, 10 Ohio App. 3d 308, 309 (1983) ("The question of whether the officer was on or off duty is irrelevant."); *State v. Glover*, 52 Ohio App. 2d 35, 38 (1976) ("A duly commissioned police officer holds a public office upon a continuing basis."). Thus, Osborne's duty status is irrelevant to whether he properly conducted the investigatory stop, and by extension cannot support a finding of probable cause.

Furthermore, Appelhans was required to consider the exculpatory evidence presented to him at the scene. For example, Osborne told Appelhans he became "leery" when he saw Dean's truck drive past his house not just a few times, but at least fifteen times (Doc. 71 at 5). Appelhans was aware of the earlier domestic dispute and related confrontation between Osborne and Dean at the Jamboree (Doc. 69 at 2–3; Doc. 72 at 9). He also was aware that this was not a typical traffic stop; rather, Dean voluntarily pulled over and approached Osborne, who identified himself as a police

officer, and Osborne was the one who initially called Dispatch and requested assistance (Doc. 69 at 3; Doc. 72 at 7). Dean and Osborne then waited in their vehicles for about fifteen minutes until Aring and Appelhans arrived (Doc. 72 at 7, 16–17). The parties dispute whether Osborne directly informed Appelhans about Dean's threat to "cause problems" for Osborne[1] -- though he did discuss it with both Aring and Dispatch (*see* Doc. 71 at 7; Doc. 72 at 5) -- or Dean's allegedly aggressive and erratic driving. At this stage of the proceedings, this Court accepts Osborne's version of the story and assumes he did communicate this information to Appelhans.

In short, Osborne identified specific facts -- the potential threat by Dean, the repeated drive-bys, and the aggressive driving -- which, informed by his training and experience, support a reasonable suspicion that Dean was trying to harass him or otherwise cause him harm at the time of the incident. Appelhans cites no evidence contradicting Osborne's version of the events. For example, he did not ask Dean whether he knew where Osborne lived, whether he had in fact threatened to "cause problems" for Osborne, or whether he had been driving aggressively through the neighborhood. Thus, based on facts known to Appelhans, a reasonable jury could conclude Osborne's detention of Dean was lawful, and Appelhans lacked probable cause to arrest Osborne for unlawful restraint.

*Improper Handling of a Firearm.* Ohio law prohibits knowingly transporting "a loaded firearm in a motor vehicle in such a manner that the firearm is accessible to the operator or any passenger without leaving the vehicle." OHIO REV. CODE § 2923.16(B). This provision does not

---

[1] Appelhans suggests Osborne's reliance on Dean's alleged threat cannot support a reasonable suspicion of criminal activity. He contends Osborne could not reasonably infer a threat of physical harm or criminal conduct from Cody Alberts' "warning," in light of the specific language used and Alberts' emotional state at the time. For purposes of evaluating the qualified immunity defense on summary judgment, this Court views all facts and draws all inferences in favor of Osborne.

apply to individuals carrying a valid concealed carry license, *id.* § 2923.16(F)(5)(a), or to law enforcement officers acting within the scope of their duties, *id.* § 2923.16(F)(1)(a).

Appelhans asserts that because Osborne was off duty, without any form of identification, he had probable cause to arrest Osborne for improper handling. He further asserts that the federal Law Enforcement Officers Safety Act ("LEOSA") requires law enforcement officers to carry their agency-issued photo ID in order to carry a concealed firearm. 18 U.S.C. § 926B(a) ("Notwithstanding any other provision of the law of any State or any political subdivision thereof, an individual who is a qualified law enforcement officer and who is carrying the identification required by subsection (d) may carry a concealed firearm that has been shipped or transported in interstate or foreign commerce"). Appelhans appears to argue the LEOSA preempts state law, to the extent the two conflict -- in other words, even if Osborne was otherwise acting within the scope of his duties as a law enforcement officer, the exception under Section 2923.16(F)(1)(a) does not apply because he was not carrying the identification required by federal law.

Osborne admits he was not carrying any identification at the time of the arrest but contends the Ohio improper handling statute does not apply because he was acting within the scope of his duties as a law enforcement officer, even though he was off duty. *See Luketic*, 134 Ohio App. 3d at 222–23; *Clark*, 10 Ohio App. 3d at 309; *Glover*, 52 Ohio App. 2d at 38. Further, he counters that the LEOSA does not apply when a law enforcement officer carries a firearm (1) intrastate, as opposed to across state lines, and (2) openly, as opposed to concealed.

As to the first point concerning the LEOSA, it is not clear the scope of the statute is limited to officers carrying firearms during interstate travel. Neither party cites authority addressing this question, but the more logical interpretation of the "interstate" language is that it provides the

10

jurisdictional hook required for federal gun regulations by specifying that the regulated firearm at some point moved through interstate commerce. *Cf. United States v. Lopez*, 514 U.S. 549, 561–62 (1995). Regardless, Osborne's second point is well taken. The plain language of the LEOSA authorizes and regulates *concealed* carry, and it is undisputed Osborne was openly carrying his service weapon at the time of the incident. Thus, the LEOSA is inapplicable here, and this Court returns to the question of whether Osborne violated the Ohio statute. As discussed in more detail above, the facts viewed in the light most favorable to Osborne suggest he was acting within the scope of his duties as a law enforcement officer when he followed and ultimately detained Dean. As such, he was not subject to the restrictions of Section 2923.16, and a reasonable jury could find Appelhans therefore lacked probable cause for the arrest.

*Aggravated Menacing.* "No person shall knowingly cause another to believe that the offender will cause serious physical harm to the person or property of the other person." OHIO REV. CODE § 2903.21(A). Appelhans contends he had probable cause to arrest Osborne because Osborne caused Dean to believe he might use his firearm against him by telling Dean he was armed and ordering Dean to return to his vehicle and stay there. Osborne contests this characterization and denies intentionally announcing to Dean that he was armed. Instead, he speculates Dean must have overheard him inform Dispatch he was carrying his handgun and insists the gun could not have been visible to Dean from where he was standing (*see* Doc. 51 at 49–50; Doc. 58 at ¶ 10).

Dean prepared a witness statement at the scene of the incident (Doc. 50-7). In that statement, Dean reported he discovered Osborne was armed because he could see the handgun on his lap when he approached Osborne's vehicle (*id.* at 1). He did not claim Osborne announced he was armed or brandished his weapon (*see id.*) ("As I approached him he then told me to not go anywhere with his

11

hand on his gun on his lap"). Nor does the transcript of Dean's conversation with Aring include any such allegation, and Aring's supplemental report confirmed Dean observed Osborne's hand on the gun in his lap "which scared him and made him feel threatened" (Doc. 53-6 at 1). In other words, the record is devoid of evidence suggesting Appelhans had reason to believe Osborne intentionally announced or displayed his firearm to threaten Dean with physical harm. A reasonable jury could find that the information available to Appelhans thus did not establish probable cause.

**Qualified Immunity**

Osborne has established a prima facie case for a violation of a constitutional right. The inquiry now becomes whether the "contours of the right" were "sufficiently clear that a reasonable official would understand" his behavior violated that right. *Anderson*, 483 U.S. at 640. "This inquiry turns on the 'objective legal reasonableness of the action,'" *Pearson*, 555 U.S. at 244 (citation omitted), and "must be undertaken in light of the specific context of the case, not as a broad general proposition . . . ." *Saucier*, 533 U.S. at 201. Accordingly, the issue is "whether [Appelhans'] actions—as described by [Osborne's] evidence—were objectively unreasonable, and whether the law clearly established that unreasonableness at the time of the incident." *Thompson*, 831 F.3d at 371–72.

It is clearly established that arresting an individual without probable cause violates the Fourth Amendment. *Crockett*, 316 F.3d at 580. Further, "a reasonably competent public official should know the law governing his conduct." *Harlow*, 457 U.S. at 819. Thus, a reasonable police officer is presumed to know both the standard for probable cause and the elements of the statutes he is charged with enforcing. Crediting Osborne's version of events, a reasonable officer would have known: (1) Osborne had a reasonable suspicion sufficient to temporarily detain Dean; (2) Osborne was acting within the scope of his duties as a law enforcement officer; (3) the Ohio improper handling

statute does not apply to law enforcement officers acting within the scope of their duties; and (4) there is no evidence suggesting Osborne knowingly caused Dean to fear physical harm. Against this backdrop, a reasonable official would understand that arresting Osborne would violate his Constitutional rights.

Nevertheless, Appelhans argues his actions were objectively reasonable because he relied on the advice of city prosecutor Reger, who confirmed he had probable cause for the arrest. The Sixth Circuit has recognized that reliance on the advice of counsel could constitute an "extraordinary circumstance" entitling a defendant to qualified immunity despite violation of a clearly established right. *York v. Purkey*, 14 F. App'x 629, 633 (6th Cir. 2001). Yet "a law enforcement officer's phone call to a county or district attorney for general guidance when confronted with a situation where there is no legal basis for the contemplated actions does not automatically convert unreasonable actions into reasonable actions." *Cochran*, 656 F.3d at 309 (6th Cir. 2011); *see also V-1 Oil Co. v. Wyoming Dep't of Envtl. Quality*, 902 F.2d 1482, 1488 (10th Cir. 1990) ("[R]eliance [on advice of counsel] is not inherently extraordinary, for few things in government are more common than the receipt of legal advice."). In evaluating whether an "extraordinary circumstance" exists, this Court considers (1) whether the advice was unequivocal and specifically tailored to the particular facts giving rise to the controversy; (2) whether complete information was provided to the advising attorney; (3) the prominence and competence of the advice attorney; and (4) how soon after the advice was received the disputed action was taken. *York*, 14 F. App'x at 633; *see also Lewis v. Weck*, 2012 WL 8887824, at *6 (N.D. Ohio 2012).

In Appelhans' favor, he arrested Osborne immediately after conferring with Reger, which supports an inference he relied upon the advice. The record offers no reason to doubt Reger's

13

competence, and his prominence is likely not a decisive factor. *Cf. V-1 Oil*, 902 F.2d at 1489 (finding extraordinary circumstances based on advice from "fully informed, high-ranking government attorneys" regarding a new statute). On the other hand, Reger's advice cannot be described as "unequivocal," and Osborne contends Appelhans did not provide Reger with complete information.

The audio recording did not pick up Reger's side of the conversation with Appelhans (*see* Doc. 69). However, the transcript is clear that Appelhans did not tell Reger about Dean's alleged threat toward Osborne, nor did he mention the number of times Dean drove by Osborne's home or his aggressive driving tactics. And according to Reger's recollection of the discussion (Doc. 53 at 31–32):

> . . . [W]e had a discussion about what [Appelhans] believed was happening and what the facts were, and we had a discussion about what offenses. He asked me about aggravated menacing, we talked about what facts would support that, I said, it does sound like you have probable cause for that, he asked me about unlawful detainer, I said, I don't have those elements in front of me, I don't know what the elements are, I believe he looked at the elements and said something to me about the elements, I said, it sounds like it's possible. And then he wanted to know about the firearms charge and I said that I did not believe that I could answer that, that was a felony and I didn't believe I could answer any questions related to that . . . .

Reger also told Appelhans he was "more than willing" to review his report in the morning, if Appelhans wanted to "send the people on their way" without making an arrest (*id.* at 33). In other words, Reger ultimately left the ball in Appelhans' court to use his judgment as a law enforcement officer in deciding how to proceed. This is not the type of extraordinary circumstance sufficient to resurrect qualified immunity in the face of a violation of clearly established law.

## CONCLUSION

Defendant Appelhans is not entitled to qualified immunity. The Motion (Doc. 49) is denied.

IT IS SO ORDERED.

               s/ *Jack Zouhary*
               JACK ZOUHARY
               U. S. DISTRICT JUDGE

               December 20, 2016